02-10-335-CV_REH









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO.  02-10-00335-CV

 

 


 
 
 In the Interest of D.A.T., K.J.T., T.D.T., and
 S.S.T., Children
 
 
  
 
 
  
 
 
 
 
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

 

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION ON REHEARING[1]

----------

 

          After
considering Appellant I.J.T.’s motion for rehearing, we deny the motion but
withdraw our prior opinion and judgment of January 26, 2012, and substitute the
following.

I. 
Introduction

          Appellants
I.J.T. (Father) and W.T. (Mother) appeal the trial court’s judgment terminating
their parental rights to four of their children.  After a bench trial, the
trial court found by clear and convincing evidence that Father and Mother had
(1) engaged in conduct or knowingly placed the children with persons who had engaged
in conduct which endangered the physical or emotional well-being of the
children, (2) knowingly placed or knowingly allowed the children to remain in
conditions or surroundings which endangered their physical or emotional
well-being, and (3) previously had their parent-child relationships terminated
with respect to another child based on these same grounds.[2] 
The trial court also found that termination of Mother’s and Father’s
parent-child relationships would be in the children’s best interest and
appointed the Department of Family and Protective Services (the Department) as
the children’s permanent managing conservator. Father challenges the factual
sufficiency of the evidence in four issues, and Mother’s court-appointed
counsel has filed a motion to withdraw and an Anders brief in support
stating that after diligently reviewing the record, he believes that any appeal
by Mother would be frivolous.[3]  Although given notice
and an opportunity to file a pro se brief, Mother did not do so.  We affirm the
trial court’s judgment terminating Father’s and Mother’s parental rights.

II. 
Background

          Mother
and Father have six children together.  The four children involved in this case
are D.A.T., K.J.T., T.D.T., and S.S.T.  At the time of trial in September 2010,
D.A.T. was eleven years old, K.J.T. was nine years old, T.D.T. was eight years
old, and S.S.T. was five years old.  In separate proceedings in 2008 in Lubbock
County, Texas, Mother’s and Father’s parental rights to two other children, H.T.
and D.T., were terminated.

          Ashleigh
Baumgarten is a Department caseworker in Lubbock.  She served as Mother and
Father’s caseworker for almost three years beginning in approximately August
2005, and she testified that she was familiar with Mother and Father’s lengthy
history with the Department.  She testified that they had exhibited a pattern
of neglectful supervision of their children and that the Department had been
concerned for years about the manner in which they supervised (or failed to
supervise) their children.  Mother and Father’s first Department referral was
in December 1997 and involved an allegation of neglectful supervision; the
report alleged that Mother and Father’s two year old had sprayed oven cleaner
in their nine-month old’s face.[4]  Baumgarten also
testified that Mother and Father had Department referrals in March 2002 for
alleged neglectful supervision and physical abuse; July 2002 for alleged
neglectful supervision; August 2002 for alleged medical neglect, physical
abuse, physical neglect, and negligent supervision; August 2003 for alleged
negligent supervision and physical neglect; August 2004 for alleged negligent
supervision, physical abuse, and medical neglect; September 2004 for alleged
negligent supervision; and two in March 2005, both for alleged negligent
supervision and one for alleged unsanitary living conditions.  Mother and
Father also tested positive “on numerous occasions” for both marijuana and
cocaine during the Lubbock County case.

          Baumgarten
testified that several of the cases against Mother and Father were closed
because abuse had been ruled out, but the Department remained concerned about
the level of supervision in light of the injuries the children had sustained. 
Baumgarten also testified that the children are very physically aggressive
toward one another, that Mother and Father have a difficult time controlling
them, and that the family visitations were chaotic because of the children’s
behavior and the parents’ inability to control them.

          The
trial regarding the termination of Mother’s and Father’s parental rights to
H.T. was in May 2008.  Baumgarten testified that she and the Department had
decided about that same time to remove Mother and Father’s other children and
proceed toward termination of their parental rights.  However, she and the
Department lost contact with Mother and Father in June 2008 after they were
evicted from their apartment.  After an investigation, Baumgarten was told by a
relative that Mother and Father had possibly moved with their children to the
Fort Worth area.

          Sandra
Boyle is a Department investigator in Fort Worth and investigated a referral
alleging neglectful supervision by Mother in September 2009.  Boyle testified
that the apartment where Mother lived with the children was not clean; had
roaches; and did not have food, personal hygiene products, or a place for the
children to sleep.  Mother also field-tested positive for cocaine.

          Boyle
testified that the three oldest children, D.A.T., T.D.T, and K.J.T., fled the
apartment through the second-story balcony when they realized she worked for
the Department.  The children later told her they had been told to run if they
saw the police or any Department workers.  Boyle testified that Mother told her
the family had moved to Fort Worth to avoid further termination proceedings in
Lubbock.  Mother also told Boyle that the children had not been enrolled in
school for more than a year, that she had not applied for food stamps, and that
the children had not been to the doctor or taken their medication.

          Boyle
testified that she removed S.S.T. the day she visited the apartment and that
Mother called three days later and agreed to surrender the other three children
to Department custody.  Father accompanied Mother when they brought the
children; he denied living in the apartment with Mother but said he did not
want to answer any other questions.  Boyle said the children gave conflicting
accounts of how often Father lived in the apartment with them.

          Boyle
testified that D.A.T., T.D.T, and K.J.T. had an extensive amount of scars and
fresh, suspicious looking marks all over their bodies.  She testified that she
did not get an explanation for the marks, but she agreed that none of the
children required medical attention, that the marks were possibly consistent
with marks that kids might receive while rough-housing, and that the children
did not appear underweight or malnourished.

          Ildiko
Balla conducted psychological evaluations of Mother and Father.  She testified
that Father has difficulty reading and writing and is borderline intellectual
functioning.  He has difficulty paying attention and in dealing with and
parenting in new situations.  Balla also testified that Father has anxiety
issues and depressive disorder and that he needs assistance making legal,
medical, and financial decisions.  Balla testified that Father expressed how
much he misses his children, that he regrets not being there for them more, and
that he wanted to be a better father.  Balla also testified that it is possible
that Mother could provide the assistance that Father requires.

          Constance
Burdick is a counselor and clinical social worker.  She had met with the family
on a weekly basis during the two months preceding the trial. Burdick testified
that Mother is the spokesperson for the couple and that she often answers questions
directed to Father.  She testified that Mother and Father always had an excuse
or explanation for their actions or inactions instead of accepting
responsibility, and she said there is no reason to continue counseling if
Mother and Father cannot accept that improvement is possible.  Burdick testified
that Mother and Father had not admitted that they could improve their parenting
and that Mother and Father had made very little progress after six counseling
sessions.  Burdick acknowledged that Father had not expressly denied poor
parenting and that, to keep the children, Father was willing to leave Mother if
she could not stay off of drugs.  But Burdick qualified her testimony by saying
that Father cannot raise the children alone without assistance and that Mother
is not providing the assistance he needs.

          Shawna
Wells-Lewis served as the Department caseworker during much of the present
case.  She testified that both parents tested positive in March 2010 for cocaine,
that Father gave her no contemporaneous explanation, and that Mother claimed
that grease in Father’s hair caused the positive result.  The March 2010 drug
test was Father’s only positive result, and Wells-Lewis agreed that Father’s
follow-up hair follicle test was negative and that drugs were not a daily
problem for him.  Wells-Lewis testified, however, that the parents had shown a
pattern beginning with the Lubbock County proceedings of staying clean for a
time but relapsing into occasional drug use.

          Wells-Lewis
testified that both parents had attended anger management classes and that
anger management was no longer a concern.  She also agreed that Mother and
Father had not caused the children’s scars and that the children often injure
one another.  Wells-Lewis also confirmed both Mother’s and Father’s employment
with J.T. Kennard.  She testified, however, that Mother and Father had been
unsuccessfully discharged from homemaking services on one occasion and family
counseling on two occasions.

          Wells-Lewis
testified that the family had visitation every two weeks for an hour and a
half.  Mother and Father consistently attended the visitations, but Wells-Lewis
personally supervised the visitations because they were so chaotic.  The
children were aggressive with one another, the parents could control only one
child at a time, and the parents did not pay attention to the risks that their
children could be injured.  At one visitation at a playground, Father went to a
different playground area to play tic-tac-toe by himself.  Wells-Lewis
testified that this visitation was similar to most of the other visitations.

          Wells-Lewis
described D.A.T. as more withdrawn than the other children during visitations,
saying that he “takes on more of the parental role.”  She testified that D.A.T.
“loves his parents very much, and he always wants [Mother] to braid his hair.” 
She described S.S.T. as very withdrawn during recent visitations and said that
she had stayed to herself drawing pictures.  Wells-Lewis testified that T.D.T.
and K.J.T. look forward to visitations, hang all over their parents during the
visits, and fight for Mother’s and Father’s attention.  She testified that all
of the children love their parents and want to return home.

          Wells-Lewis
acknowledged that the children had been in four foster homes in the previous
year, but she said three of those placement changes were due to the children’s
behavioral problems.  D.A.T. and S.S.T. live together, and T.D.T. and K.J.T.
each live in different foster homes.  T.D.T. and K.J.T. initially lived with
D.A.T. and S.S.T. but were moved because of their behavior.  Wells-Lewis agreed
that it is not wise to continually move the children because of their
adjustment disorders.

          Wells-Lewis
testified that S.S.T. is the best-behaved of the children but that she “has a
difficult time with no and she screams and hollers and has tantrums and can be
very bossy and will bully the others.”  She testified that K.J.T. has “severe
behavior issues”; that he will scream, throw tantrums, scratch himself, try to
hurt himself; and that “he will go on for an hour at a time when he doesn’t get
his way, . . . even try[ing] to destroy property.”  D.A.T. lies, bullies other
children, gets into fights at school, and has tried to get S.S.T. to steal for
him.  T.D.T. also fights and scratches himself.  He will often have meltdowns
“to where he can’t function, and he’ll just scream and scratch himself and not
be able to function.”  Wells-Lewis categorized D.A.T’s. and S.S.T.’s required
level of care as moderate and T.D.T.’s and K.J.T.’s level of care as
specialized.  She testified that D.A.T.’s behavior had improved significantly
in a foster home and that T.D.T. and K.J.T. had experienced small improvements
but were still scratching themselves eleven months after removal.

          Wells-Lewis
testified that she had looked into several placement options for the children
with family members and friends but that none were appropriate. For example, B.T.
left D.A.T. in a car by himself while shopping; D.W.F. and C.T.F. had allowed
Mother and Father contact with the children without Department supervision;
K.M. and E.P. refused placement; J.W., L.W., and V.A. were denied placement
because of a history with the Department; S.F. twice withdrew from the home
study; N.T. had an open investigation concerning neglectful supervision; and
H.T. and D.T.’s parents refused placement.[5]  The children’s current
foster parents do not want to adopt, but Wells-Lewis testified that there are
services available to work with the children and any prospective adoptive
parents that will be beneficial and make the children adoptable.  In addition,
Wells-Lewis testified that although the children were not easily adoptable, she
planned to enroll the children in an intensive adoption program to facilitate
placement.

          Wells-Lewis
testified that the children have a special need for a stable and very secure
environment because of their behavioral issues and that Mother and Father
cannot safely parent the children.  In her opinion, Mother and Father have been
offered all of the services that can be offered.  They completed some of their
service plan, but they are not demonstrating the skills they should have learned
from working the service plan.  Wells-Lewis testified that she is concerned
about Mother’s and Father’s ability to provide a stable, clean, and safe
environment for the children; their lengthy history with the Department; their
drug use; and their consistent failure to provide for the children.  She
testified she believes, given Mother’s and Father’s lack of improvement and
drug history and despite the strong bond between them and their children, that
it is in the children’s best interest to terminate Mother’s and Father’s
parental rights.

          Lara
Hastings is a psychologist.  She conducted psychological evaluations of each
child.  She also conducted a sibling assessment with the goal of determining
the best way to work with the children because of their strong bond but
frequent fighting.  In the sibling assessment, Hastings determined that sibling
therapy could not succeed with all four until K.J.T. and T.D.T. can stabilize
their behavior and productively participate.  In fact, Hastings testified that
she felt K.J.T. and T.D.T. had deteriorated since she had conducted individual
psychological assessments approximately nine months earlier.

          Hastings
testified that T.D.T. has an adjustment disorder with behavioral and emotional
disturbances.  He experiences distress from being separated from Mother and
“possibly both of his parents,” and he experiences stress from his home
environment.  T.D.T. also has depressive disorder that manifests itself in
acting out, anger, and suicidal ideations, and it causes him to be emotionally
overwhelmed.  Hastings testified that T.D.T. may also have attention deficit,
hyperactivity disorder (ADHD) and may be borderline intellectual functioning
and that those things need to be ruled out or confirmed.

          Hastings
testified that D.A.T. has adjustment disorder that manifests with emotional and
behavioral disturbances.  K.J.T. has the same adjustment disorder with similar
manifestations, but he also has ADHD.  Math disorder, reading disorder, and
borderline intellectual functioning also need to be confirmed or ruled out for
K.J.T.  S.S.T. is the best-adjusted of all of the children, but she also has
adjustment disorder with emotional distress manifestations and is “perturbed” by
being separated from Mother.

          Hastings
testified that all of the children lack awareness of appropriate boundaries and
that their home environment before entering foster care contributed to their
adjustment disorders.  She also testified that each of the children’s
adjustment disorder could be treated through additional therapy.

          Elvina
Hiatt is the court-appointed special advocate (CASA) for the children.  She
testified that Mother’s and Father’s past drug use concerns her and that she
worries about keeping the children in a status where they could ultimately be
returned to their parents.  Hiatt also expressed concern over Mother’s and
Father’s lack of progress after working their service plan and testified that
she does not believe Mother and Father will ever change since they have had
years of Department history without change.

          Hiatt
described D.A.T. as a shy child who is respectful of his foster mother and who
seems to be doing well.  She described S.S.T. as very open and talkative,
dramatic and creative, very sweet, and doing well in foster care.  Hiatt
testified that K.J.T. is more active and less able to control his behavior. 
She testified that he seems calmer in his newest foster placement but
acknowledged that he had not been there long enough to consider his behavioral
change permanent.  Hiatt described T.D.T. as extremely shut down toward her
initially but that he had opened up over time.  She said, however, that
“something happened,” and T.D.T. reverted back to being shut down.  He opened
up again after being transferred to a therapeutic foster home.

          Hiatt
also testified about each of the children’s progress in school.  S.S.T. is on
target and doing well.  D.A.T. is one grade-level behind and reads two years
behind for his age, and T.D.T. will probably repeat first grade.  K.J.T. is one
grade-level behind for his age, and he was recently placed in special education
classes.

          Hiatt
testified that the children are active, rowdy, and rough during visitations and
that although Mother yells directives to them, they largely ignore her.  She
testified that Father is not very active in the visitations and will
occasionally play with the children, and she said that the children do not
approach Father to interact with him.  Hiatt testified that Father will
occasionally discipline the children but that they do not usually respond
unless Mother also gets involved.  She agreed that Father had been more active
and involved with the children during recent visitations, but she testified
that his parenting skills seem not to have progressed.  Hiatt also testified
that, in her opinion, the children separate well from their parents after
visitations.

          Hiatt
testified that K.J.T. talks about his parents a lot and wants to go home. 
D.A.T. says he wants to go home, but when he does so, he does not make eye
contact, speaks very softly, and acts as if he is not being honest.

          Hiatt
recommended termination of Mother’s and Father’s parental rights.  She does not
believe Mother and Father can provide a safe environment for the children, and
she testified that she believes the children have better opportunities in
foster care than Mother and Father can provide.

          Mother
testified that Father had recently been very helpful by becoming more involved
with the children’s discipline and that she had learned in parenting classes
that both parents must be involved.  Mother also testified that she had learned
in homemaking classes the importance of setting priorities and of practicing
financial stability.  She testified that she and Father can provide more
stability for the children than before because they have steady employment as
well as extended family and their church to support them.  Mother acknowledged that
she and Father do not currently have any money in a bank account, that they
would require government assistance, and that they would have to find a larger
place to live.  She testified, however, that she had already located a larger apartment
for the same amount of monthly rent and that her boss had offered to advance
her the money to buy beds for the children.

          J.T.
Kennard testified that he is Mother and Father’s pastor and employer. Mother
and Father have worked for him in his junkyard for approximately two years. 
Kennard testified that Mother and Father are good parents, that they
consistently attend work, and that he allowed them to miss work when they
attended appointments for their service plan.  He also testified that Mother and
Father maintain a home cleaner than his own, but he acknowledged that he had
never been inside their apartment and had only been to their apartment to pick
them up for work or for church.

          Father
testified that he does not like to talk much and that he had always been that
way.  He testified that he has supported his family since he began working for
Kennard, and he expressed his belief that he could care for the children
without Mother’s help if necessary.  Father also testified that he does not
think the children have behavior problems and that he thinks he controls them
well enough during visitations.  Father acknowledged that he does not have a
driver’s license, and he denied using cocaine in March 2010, saying that he
tested positive because he had associated with others that had used cocaine.

III. 
Applicable Law

          A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In
re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanently—to divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child’s right to inherit.  Tex.
Fam. Code Ann. § 161.206(b) (West 2008); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and
strictly construe involuntary termination statutes in favor of the parent.  Holick,
685 S.W.2d at 20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort
Worth 2009, no pet.).

          In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001; In re
J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex. Dep’t of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625, 629 (Tex.
App.—Fort Worth 2000, pet. denied).

          Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also § 161.206(a) (West 2008).  Evidence is
clear and convincing if it “will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established.”  Id. § 101.007 (West 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002); see In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007)
(contrasting standards for termination and modification).

          In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our own.  In
re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that the parent violated subsections (D) and (E) of section 161.001(1) and that
the termination of the parent-child relationship would be in the best interest
of the child.  Tex. Fam. Code Ann. § 161.001; C.H., 89 S.W.3d at
28.  If, in light of the entire record, the disputed evidence that a reasonable
factfinder could not have credited in favor of the finding is so significant
that a factfinder could not reasonably have formed a firm belief or conviction
in the truth of its finding, then the evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108.

IV. 
Father’s Appeal

          The
trial court found that Father had (1) engaged in conduct or knowingly placed
the children with persons who had engaged in conduct which endangered the
physical or emotional well-being of the children, (2) knowingly placed or
knowingly allowed the children to remain in conditions or surroundings which
endangered their physical or emotional well-being, and (3) previously had his
parent-child relationship terminated with respect to another child based on
these same grounds.  See Tex. Fam. Code Ann. § 161.001(1)(D), (E), (M). 
Father argues in his first two issues that the evidence is factually
insufficient to support the section 161.001(1)(D) and (E) findings, and he
argues in his third issue that the Department’s pleadings do not support the
section 161.001(1)(M) finding.

A.  Endangerment
Findings

          Father
argues in his first and second issues that the evidence is factually
insufficient to support the trial court’s section 161.001(1)(D) and (E)
findings.

1. 
Applicable Law

          “Endanger”
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at
533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no
pet.).  Under section 161.001(1)(D), it is necessary to examine evidence
related to the environment of the children to determine if the environment was
the source of endangerment to the children’s physical or emotional well-being. 
J.T.G., 121 S.W.3d at 125.  Conduct of a parent in the home can create
an environment that endangers the physical and emotional well-being of a
child.  In re W.S., 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no
writ).  For example, abusive or violent conduct by a parent or other resident of
a child’s home may produce an environment that endangers the physical or
emotional well-being of a child.  See id. at 776–77; Ziegler v.
Tarrant Cnty. Child Welfare Unit, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth
1984, writ ref’d n.r.e.).  Parental and caregiver illegal drug use and
drug-related criminal activity likewise supports the conclusion that the
children’s surroundings endanger their physical or emotional well-being.  See
In re S.D., 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

          Under
section 161.001(1)(E), the relevant inquiry is whether evidence exists that the
endangerment of the children’s physical well-being was the direct result of the
parent’s conduct, including acts, omissions, or failures to act.  See J.T.G.,
121 S.W.3d at 125; see also Tex. Fam. Code Ann. § 161.001(1)(E). 
Additionally, termination under (E) must be based on more than a single act or
omission; the statute requires a voluntary, deliberate, and conscious course of
conduct by the parent.  J.T.G., 121 S.W.3d at 125; see Tex. Fam.
Code Ann. § 161.001(1)(E).  It is not necessary, however, that the
parent’s conduct be directed at the children or that the children actually
suffer injury.  Boyd, 727 S.W.2d at 533; J.T.G., 121 S.W.3d at
125.  The specific danger to the children’s well-being may be inferred from
parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re
R.W., 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

2. 
Discussion

          Baumgarten,
Mother and Father’s caseworker in Lubbock, described Mother and Father’s
lengthy history with the Department, their nine Department referrals between
1997 and 2005, and their drug use.  Boyle, the investigator in Fort Worth,
testified that the children had not been enrolled in school for more than a
year in 2009, that Mother had not applied for food stamps, and that the
children had not been to the doctor or taken their medication.  Father denied
living in the apartment with Mother and the children at the time but declined
to answer additional questions, and the children gave conflicting accounts of
how often Father lived in the apartment with them.

          Burdick,
the counselor for the family, testified that Mother and Father always had an
excuse or explanation for their actions or inactions instead of accepting
responsibility, and she said there is no reason to continue counseling if
Mother and Father cannot accept that improvement is possible.  Burdick
acknowledged that Father had not expressly denied poor parenting, but she
testified that Father cannot raise the children alone without assistance.

          Although
she agreed that drugs were not a daily problem for Father, caseworker Wells-Lewis
testified that both parents tested positive in March 2010 for cocaine, that
Father gave her no contemporaneous explanation, and that Mother claimed that
grease in Father’s hair caused the positive result.  Wells-Lewis also
testified, however, that both parents had a pattern of staying clean for a time
but relapsing into occasional drug use.

          Wells-Lewis
described the children as aggressive with one another, and she testified that
neither parent pays attention to the risks that their children could be
injured.  She also testified that Mother and Father cannot safely parent the
children.  In her opinion, Mother and Father have been offered all of the
services that can be offered.  Although they completed some of their service
plan, they have not, in her opinion, demonstrated the skills they should have
learned from working the service plan.  Hiatt, the CASA, also expressed concern
over Mother’s and Father’s lack of progress after working their service plan
and testified that she does not believe Mother and Father will ever change
since they have had years of Department history without change.  Father
testified that he does not think the children have behavior problems and that he
controls them well enough during visitations.

          After
reviewing the entire record, we hold that a factfinder could reasonably form a
firm conviction or belief that Father had engaged in conduct or knowingly
placed the children with persons who had engaged in conduct which endangered
the physical or emotional well-being of the children or that Father had
knowingly placed or knowingly allowed the children to remain in conditions or
surroundings which endangered their physical or emotional well-being.  See
Tex. Fam. Code Ann. § 161.001(1)(D), (E); C.H., 89 S.W.3d at 28. 
We therefore overrule Father’s first and second issues.[6]

B. 
Best Interests of the Children

          Father
argues in his fourth issue that the evidence is factually insufficient to
support the trial court’s finding that termination of his parental rights to
the children is in the children’s best interest.  See Tex. Fam. Code
Ann. § 161.001(2) (requiring clear and convincing evidence “that termination is
in the best interest of the child”).

1. 
Applicable Law

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1) the child’s age and
physical and mental vulnerabilities;

(2) the frequency and nature
of out-of-home placements;

(3) the magnitude, frequency,
and circumstances of the harm to the child;

(4) whether the child has been the
victim of repeated harm after the initial report and intervention by the
department or other agency;

(5) whether the child is
fearful of living in or returning to the child’s home;

(6) the results of psychiatric,
psychological, or developmental evaluations of the child, the child’s parents,
other family members, or others who have access to the child’s home;

(7) whether there is a history of
abusive or assaultive conduct by the child’s family or others who have access
to the child’s home;

(8) whether there is a history of
substance abuse by the child’s family or others who have access to the child’s
home;

(9) whether the perpetrator
of the harm to the child is identified;

(10) the willingness and ability of
the child’s family to seek out, accept, and complete counseling services and to
cooperate with and facilitate an appropriate agency’s close supervision;

(11) the willingness and ability of
the child’s family to effect positive environmental and personal changes within
a reasonable period of time;

(12) whether the child’s family
demonstrates adequate parenting skills, including providing the child and other
children under the family’s care with:

(A) minimally adequate health and
nutritional care;

(B) care, nurturance, and
appropriate discipline consistent with the child’s physical and psychological
development;

(C) guidance and supervision
consistent with the child’s safety;

(D) a safe physical home
environment;

(E) protection from repeated
exposure to violence even though the violence may not be directed at the
child;  and

(F) an understanding of the
child’s needs and capabilities;  and

(13) whether an adequate social
support system consisting of an extended family and friends is available to the
child.

Id. § 263.307(b);
R.R., 209 S.W.3d at 116.  Other, nonexclusive factors that the trier of
fact in a termination case may use in determining the best interest of the
child include:

(A)        
the desires of the child;

(B)        
the emotional and physical needs of the child now and in the future;

(C)       
the emotional and physical danger to the child now and in the future;

(D)       
the parental abilities of the individuals seeking custody; 

(E)        
the programs available to assist these individuals to promote the best
interest of the child;

(F)        
the plans for the child by these individuals or by the agency seeking
custody;

(G)       
the stability of the home or proposed placement;

(H)       
the acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one; and

(I)          
any excuse for the acts or omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

2. 
Discussion

          The children range in age from eleven to
five years old, and each is emotionally vulnerable.  K.J.T. has ADHD, and T.D.T.
has a depressive disorder that manifests through suicidal ideations and anger. 
Each child has an attachment disorder, takes medication, and has behavioral
issues.  Three of the four children are not on pace academically.  Wells-Lewis
testified that the children have a special need for a stable and very secure
environment.  See Holley, 544 S.W.2d at 372 (listing “the emotional and
physical needs of the child now and in the future” as relevant to best interest
determination).

          Father has difficulty reading and writing, is
borderline intellectual functioning, and needs assistance with making legal,
medical, and financial decisions.  He also has anxiety issues, a depressive
disorder, and difficulty parenting in new situations.  See In re T.T.F.,
331 S.W.3d 461, 488 (Tex. App.—Fort Worth 2010, no pet.) (considering mother’s
inability to recognize risk to her child and mother’s intellectual capacity in
best interest analysis).  Mother is the spokesperson for the couple.  Father is
often detached, even at visitations, but had exhibited improvement just before
trial.  But see In re Z.C., 280 S.W.3d 470, 476 (Tex. App.—Fort Worth
2009, pet. denied) (explaining that a father’s “efforts to improve his ability
to effectively parent on the eve of trial [were] not enough to overcome a
decade of poor parenting and neglect”).

          Father expressed regret about being
separated from his children, a desire to be a better father, and a willingness
to leave Mother if necessary, but Burdick testified that Father cannot raise
the children alone without assistance.  Father also tested positive for cocaine
six months before trial.  See Tex. Fam. Code Ann. § 263.307(b)(8) (listing
history of drug use as relevant best interest factor).

          The children are aggressive with one
another, and Mother and Father do not seem to grasp the risk of injury to their
children in various settings, including supervised visitations.  There is no evidence
that Mother or Father physically abused the children, but the children
apparently injure one another.  Mother and Father had nine Department referrals
while living in Lubbock, and all of the referrals involved neglectful
supervision.  The children were removed from Mother and Father twice in Lubbock
and might have been removed again, but the family moved to Fort Worth.  When
the children were removed in Fort Worth in 2009, they had extensive scarring
and bruising on their bodies.

          Father has not denied poor parenting, but
there is testimony that he and Mother always offer excuses rather than an
acknowledgement of responsibility. Mother and Father had not admitted that they
could improve their parenting, and Father denied at trial that the children have
behavioral problems.  There is also testimony that Mother and Father had not demonstrated
the skills they should have learned through the service plan and that they have
been offered all of the services that can be offered.  See id. §
263.307(b)(10), (11) (listing as relevant best interest factors the parents’
willingness to accept and complete services offered and to effect positive
changes within reasonable time).

          Father testified that he has support
available from family and friends, and Mother testified that she and Father could
provide more stability than before because of their steady employment, their extended
family, and the support offered by their church.  Their employer has also
offered assistance in the form of advances on their wages when necessary to buy
things for the children.  See id. § 263.307(b)(13) (listing social
support system as relevant best interest factor).  Mother and Father, combined,
earned approximately $37,440 per year and had lived in the same townhome for
approximately nine months before trial.  Mother admitted, however, that she and
Father would have to find a larger place to live if the children were returned
to them, and Mother had found one for the same rent.

          There is a strong bond between the children
and their parents, and the children would like to return to their parents.  See
Holley, 544 S.W.2d at 372 (listing desires of child as relevant to best
interest analysis).  The children had been in foster care for almost one year
at the time of trial, and although they had been in multiple foster homes,
three of the changes were a result of the children’s behavioral problems.

          Wells-Lewis testified that the Department
would like to have the children adopted.  See id. (listing proposed
placement plan as relevant to child’s best interest). Wells-Lewis testified
that she had looked into almost twenty family members and friends as possible placements
for the children but that none were appropriate.  The children’s current foster
parents do not want to adopt, but Wells-Lewis testified that the Department has
services available to work with the children and any prospective adoptive
parents to facilitate adoption.

          Considering
the factors listed in family code section 263.307(b) and discussed in Holley,
and viewing all the evidence in a neutral light, we conclude that the trial
court could reasonably form a firm conviction or belief that termination of
Father’s parental rights is in the children’s best interests.  See H.R.M.,
209 S.W.3d at 108; see also Shaw v. Tex. Dep’t of Family & Protective
Servs., No. 03-05-00682-CV, 2006 WL 2504460, at *7 (Tex. App.—Austin Aug.
31, 2006, pet. denied) (mem. op.) (holding despite improvement before trial,
termination was in child’s best interest considering mother’s borderline
intellectual functioning, psychological disorder, drug dependence, lack of
improvement in parenting skills, and lack of accountability).  We therefore hold
that the evidence is factually sufficient to support the trial court’s best
interest finding, and we overrule Father’s fourth issue.

V. 
Mother’s Appeal

          Mother’s
court-appointed appellate counsel has filed a motion to withdraw as counsel and
a brief in support of that motion.  In the motion, counsel avers that he has
conducted a professional evaluation of the record and, after a thorough review
of the applicable law, has reached the conclusion that there are no arguable
grounds to be advanced to support an appeal of this cause and that the appeal
is frivolous.

          Counsel’s
brief and motion meet the requirements of Anders by presenting a
professional evaluation of the record demonstrating why there are no reversible
grounds on appeal and referencing any grounds that might arguably support the
appeal.  See Anders, 386 U.S. at 741, 87 S. Ct. at 1398; Mays v.
State, 904 S.W.2d 920, 922–23 (Tex. App.—Fort Worth 1995, no pet.).  This
court has previously held that Anders procedures apply in parental
rights termination cases when the Department has moved for termination.  In
re K.M., 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.).  Mother
was given the opportunity to file a pro se brief on her own behalf, but she did
not do so.

          In
our duties as a reviewing court, we must conduct an independent evaluation of
the record to determine whether counsel is correct in determining that the
appeal is frivolous.  See Stafford v. State, 813 S.W.2d 503, 511 (Tex. Crim.
App. 1991); Mays, 904 S.W.2d at 923.  Only then may we grant counsel’s
motion to withdraw.  See Penson v. Ohio, 488 U.S. 75, 82–83, 109 S. Ct.
346, 351 (1988).

          We
have carefully reviewed the appellate record and Mother’s appellate counsel’s
brief.  We agree with her appellate counsel that the appeal is wholly frivolous
and without merit.  We find nothing in the record that might arguably support
the appeal.  See Bledsoe v. State, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005);
Taylor v. Tex. Dep’t of Protective & Regulatory Servs., 160 S.W.3d 641,
646–47 (Tex. App.—Austin 2005, pet. denied).  Therefore, we grant Mother’s
appellate counsel’s motion to withdraw and affirm the trial court’s judgment
terminating Mother’s parental rights to her children.

VI. 
Conclusion

          Having
granted the motion to withdraw filed by Mother’s counsel, and having overruled
Father’s dispositive issues, we affirm the trial court’s judgment terminating Father’s
and Mother’s parental rights to D.A.T., K.J.T., T.D.T., and S.S.T.

 

ANNE GARDNER
JUSTICE



PANEL: 
LIVINGSTON,
C.J.; DAUPHINOT and GARDNER, JJ.

 

DAUPHINOT,
J., concurs without opinion.

 

DELIVERED:  May 31, 2012









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Fam. Code
Ann. § 161.001(1)(D), (E), (M) (West Supp. 2011).





[3]See Anders v.
California, 386 U.S. 738, 87 S. Ct. 1396 (1967).





[4]Neither child involved in
the December 1997 incident is involved in this case.





[5]Mother’s and Father’s
parental rights to H.T. and D.T. were terminated in the Lubbock County
proceedings in 2008.





[6]Along with a best interest
finding, a finding of only one ground alleged under section 161.001(1) is
sufficient to support a judgment of termination.  In re E.M.N., 221
S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).  We thus need not address
Father’s third issue.  See id.; see also Tex. R. App. P. 47.1,
47.4.